564 F.Supp. 552 (1983)
MONSANTO COMPANY, Plaintiff,
v.
ACTING ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.
No. 79-366C (1).
United States District Court, E.D. Missouri, E.D.
April 19, 1983.
Judgment April 12, 1983.
*553 Gary Dyer, Kansas City, Mo., Kenneth Heineman, St. Louis, Mo., W. Wayne Withers, Monsanto Agricultural Prod. Co., St. Louis, Mo., for plaintiff.
Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., Patrick J. Cafferty, Atty., Pollution Control Section, U.S. Dept. of Justice, Washington, D.C., for defendant.

MEMORANDUM
WANGELIN, Chief Judge.
This matter is before the Court for a decision on the merits after a bench trial which spanned weeks and generated a 690 page transcript, numerous depositions, exhibits and affidavits. At issue is the constitutionality of Sections 3(c)(1)(D), 3(c)(2)(A) and Sections 10(b) and 10(d) of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), as amended in 1978, 7 U.S.C. § 136 et seq. Plaintiff seeks an injunction and declaratory judgment blocking operation of the Sections in question. Both parties have ably presented and briefed their respective positions and have provided the Court with a concise and thorough foundation for its decision.
Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court hereby makes the following findings of fact and conclusions of law. Any finding of fact equally applicable as a conclusion of law is hereby adopted as such and, conversely, any conclusion of law applicable as a finding of fact is adopted as such.

Findings of Fact
1. Plaintiff, Monsanto Company, is incorporated in the State of Delaware and has its principal place of business in St. Louis County, Missouri. Plaintiff owns and operates its principal corporate and administrative offices, and its major research facilities in St. Louis County, Missouri. It is licensed to do business in the State of Missouri and resides in this judicial district.
2. Defendant is the Acting Administrator of the United States Environmental Protection Agency (hereinafter EPA), and is charged with the implementation, administration and enforcement of the Federal Insecticide, Fungicide and Rodenticide Act. Defendant is sometimes hereinafter referred to as the "Administrator".
3. Since FIFRA was first enacted in 1947, it has required the registration of all *554 pesticides shipped in interstate commerce. In order to obtain the registration of a pesticide under FIFRA an applicant was required to support its application for registration with extensive research and test data demonstrating that the product would comply with FIFRA, that is, that the pesticide was effective for its recommended uses, and that it would perform its intended functions without unreasonable adverse effects on man, vertebrate animals and desirable vegetation. If use of the pesticide for which registration was sought could result in residues in or on raw agricultural commodities, the applicant was also required to submit in support of its application for registration extensive research and test data relating to the proposed application of the pesticide, its toxicity, the manner in which it was metabolized, its degradation, and its residues. This information was also required to be submitted in a petition for a tolerance for the pesticide for which registration was sought.
Until 1970, the Secretary of the United States Department of Agriculture (hereinafter USDA) administered FIFRA. Also, until 1970, the Secretary of Health, Education and Welfare, by and through the Food and Drug Administration (hereinafter FDA), was authorized to establish tolerances for pesticide chemicals in or on raw agricultural commodities under Section 408 of the Food, Drug and Cosmetic Act, 21 U.S.C. § 346a. These administrative functions of the USDA and FDA were transferred to EPA in December, 1970, by Reorganization Plan No. 3 of 1970, 35 Fed.Reg. 15623 (1970).
4. The term "pesticide" is defined in Section 2(u) of FIFRA to mean (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, and (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or dessicant." (FIFRA Section 2(u)).
The person holding the registration that permits the product to be sold or distributed is known as a "registrant."
5. One of the two basic kinds of pesticide products is an "end-use product" or "formulated product" designed to be used as sold or after dilution by the user against pests. An end use product contains at least one active ingredient which is defined in Section 2(a) of FIFRA as "an ingredient which will prevent, destroy, repel or mitigate any pest" or which will defoliate, dessicate or regulate the growth of plants. In order for an end use product to be used against pests and plants the active ingredient normally must be combined with "inert ingredients" which dissolve, dilute or stabilize the active ingredient or otherwise improve its pesticidal performance.
6. A second basic kind of pesticide product is a "manufacturing-use product" which is a product designed to be used to manufacture an end use product. A manufacturing use product generally is a relatively pure form of the active ingredient and is sometimes referred to as a technical product.
7. Approximately 40,000 pesticide products are currently registered under FIFRA. Most of these registered products are end use products (about 2,500 are registered for manufacturing use). Many of these end use products are very similar, containing the same active ingredient and closely similar inert ingredients.
8. A relatively few firms actually produce all the active ingredients. Of the more than 4,000 registrants, therefore, most are engaged in producing end-use products, using active ingredients they purchase (these firms are usually referred to as "formulators"). Some firms, such as Monsanto, produce both active ingredients and end-use products. A firm which produces an active ingredient may use it solely for incorporation into its own end-use products, may sell it (in the form of a manufacturing-use product) to formulators, or may do both.
9. Most of the research and testing on pesticides, and invention and development of new active ingredients, has been done by a few, relatively large companies of which Monsanto is one. Most, if not all, firms of *555 this type, including Monsanto, are engaged in foreign or multinational pesticide sales.
10. Monsanto is involved in research and development activities to attempt to develop new pesticide products. These research and development efforts have resulted in the expenditure of millions of dollars by Monsanto and their efforts have resulted by the granting of patents for many of the new active ingredients which Monsanto has developed.
11. A company's decision to develop pesticides requires it to make major commitments long before it can anticipate developing a commercial pesticide and even longer before it can expect any return on its investment. First, the company must synthesize, test and evaluate candidate pesticides typically for 4 to 8 years before it will identify a commercial candidate. It must then conduct extensive research for at least 6 additional years, including 2 years to obtain registration, before it can anticipate first marketing a product. Generally, a further 4 to 8 years will elapse before that product reaches a point where its costs of discovery, development and commercialization have been recovered. Second, the company must commit to the employment of a large scientific research group representing many disciplines, and to the acquisition of the necessary physical facilities and sophisticated equipment to conduct the intensive research required to assure some reasonable probability of success in discovering and commercializing a candidate pesticide. Third, any such company must usually commit to the expenditure of $5 million to $15 million annually for several years before it will develop a potential commercial pesticide candidate. Even then, it will not know whether the candidate will become a commercial product until it has conducted further evaluation for an additional four or more years. This further evaluation could dictate that the candidate be rejected at any point during its development, even in the final year of its further evaluation. A key element in the above analysis is whether the chemical can be patented, thereby assuring Monsanto monopoly protection for the patented chemical, use or process during the period of the patent.
12. Once a target is selected, a company must devise extremely efficient, unique and technically sound ways of determining what compounds should be synthesized. The Company's chemists are not only concerned with synthesizing new chemicals, but equally important, are concerned with new chemical processes, techniques, and methods of synthesis to facilitate their invention of such new chemicals with commercial potential. Once a company decides that a new area of chemistry might be fruitful, these chemists then proceed to develop and synthesize new compounds in that area of chemistry. These new compounds are referred to biologists who determine whether they are biologically active and whether they are pesticide candidates. This biological information is crucial in making the difficult technical judgment whether a compound is worthy of further study. The biologists and the chemists then examine and discuss the results to determine which directions, if any, offer further leads. Using the knowledge obtained from these discussions, the chemists synthesize more new compounds in the directions in which leads are expected. This constant dialogue takes place between literally dozens of organic chemists and biologists and is what ultimately produces the lead which results in a new commercial pesticide.
Decisions on most of the thousands of chemicals synthesized by plaintiff are made after an initial evaluation called a primary screen which allows plaintiff to determine the probability of a compound becoming commercially successful. With most compounds, this probability is virtually zero, and these compounds are rejected. However, Monsanto can and usually does seek patents on any chemicals with commercial potential, even if they do not themselves decide to develop those chemicals.
13. When EPA registers a pesticide product under FIFRA, what it actually is doing is approving the composition and labeling for that product and allowing that *556 product to then be sold with the approved labeling being used.
14. A label must contain: 1) general information such as the name of the company, the type of product, and the registration number; 2) hazard statements; 3) directions for use; and 4) limitations on use.
15. The hazard statements required to appear on the label include precautionary statements and a statement of physical hazards. The precautionary statements, inter alia, inform the user of the relative toxicity of the pesticide and set out an antidote in the event a person is poisoned by the pesticide. The statement of physical hazards contains information regarding things such as the flammability of the product, how the product should be stored, and how the container should be disposed.
16. The directions for use set forth the manner in which the pesticide is to be used. It is illegal for any person to use a pesticide for any purpose other than that stated in the directions for use. With respect to agricultural chemicals the directions for use inform the user of the type of crops to which the pesticide may be applied, the pests which it can be used to control, the dosage rate which must be used, and the method of application.
17. The limitations on use include restrictions such as a pre-harvest interval which provides that the pesticide must be applied more than a certain number of days before it is harvested or a rotational crop limitation which provides that specifically-named crops should not be planted for a certain time in the field to which the pesticide has been applied.
18. FIFRA was originally enacted in 1947 (P.L. 80-104, 61 Stat. 163). Under the terms of the original statute pesticide manufacturers were required to obtain a registration from the United States Department of Agriculture (USDA) before distributing or selling their pesticide products in interstate commerce. 7 U.S.C. § 135a (1970).
19. In order to obtain a pesticide registration under 1947 FIFRA the applicant for registration was required to file with USDA a statement which included the following information:
(1) the name and address of the applicant for registration and the name and address of the person whose name will appear on the label, if other than the applicant for registration;
(2) the name of the economic poison;
(3) a complete copy of the labeling accompanying the economic poison and a statement of all claims to be made for it, including the directions for use; and
(4) if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based.
7 U.S.C. § 135a (1970).
The test data required under 7 U.S.C. § 135b(a)(4) essentially consisted of efficacy data and limited tests concerning the health and safety dangers of the pesticide products, (particularly its acute toxicity).
20. On October 20, 1972, FIFRA was amended by the Federal Environmental Pesticide Control Act of 1972, (Pub.L.No. 92-516, 92d Cong., 2d Sess., October 21, 1972), (FEPCA). Pursuant to this amendment, the registration requirements were extended to pesticides shipped in intrastate commerce and authority was provided for the classification of pesticides and the regulation of their use. All of the requirements for the submission of research and test data were retained. Moreover, the data to be submitted under the 1972 amendments was the same general kinds of information that were required under the 1947 Act. The requirements for obtaining a registration were also strengthened so that the 1972 amendments were described as having "changed FIFRA from a labeling law into a comprehensive regulatory statute that ... more carefully control[s] the manufacture, distribution and use of pesticides." H.R. Rep.No. 92-511, 92 Cong., 1st Sess. 4 (1971), U.S.Code Cong. & Admin.News 1972, p. 3993.
21. Section 3(c)(1)(D) of FIFRA sets forth the requirements for submission by an applicant for registration of information, research and test data to support his application. *557 This Section as enacted in 1972 provided as follows:
(D) if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section 10(b). If the parties cannot agree on the amount and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If the owner of the test data does not agree with said determination, he may, within thirty days, take an appeal to the federal district court for the district in which he resides with respect to either the amount of the payment or the terms of payment, or both. In no event shall the amount of payment determined by the court be less than that determined by the Administrator.
22. In Section 3(c)(1)(D) as enacted in 1972, Congress authorized the Administrator to use and consider information, research and test data submitted by a previous applicant for registration to support the application of a subsequent application, but only upon satisfaction of two preconditions. Although the Administrator could use any and all data previously submitted under FIFRA for purposes of determining the adequacy of the particular data submitted by an applicant to obtain a specific registration, the Administrator could not use any of the previously submitted data for the benefit of such applicant, that is, in support of his application, unless the owner of the previously submitted data first granted his permission or the applicant for whose benefit the previously submitted data would be used offered to pay reasonable compensation to its owner. If, however, any of the previously submitted data to be considered in support of the application contained or related to trade secrets or other information protected from disclosure by Section 10(b) of FIFRA, including confidential commercial information, then without the owner's permission it could not be used at all.
23. Section 10 of FIFRA relates to the information, research and test data of an applicant which contains or relates to trade secrets or other confidential or privileged commercial or financial information. This data was prohibited from disclosure under Section 10 as enacted in 1972 which then provided in part as follows:
(b) Disclosure. Notwithstanding any other provision of this Act, the Administrator shall not make public information which in his judgment contains or relates to trade secrets or commercial or financial information obtained from a person and privileged or confidential, except that, when necessary to carry out the provisions of this Act, information relating to formulas of products acquired by authorization of this Act may be revealed to any Federal agency consulted and may be revealed at a public hearing or in findings of fact issued by the Administrator. (emphasis added).
24. In an attempt to resolve controversy which had developed about the effective date of Section 3(c)(1)(D) and the data to which that section applied, Congress enacted FIFRA of 1975, Pub.L.No. 94-140, 89 Stat. 751 (1975 amendments). The 1975 amendments revised Section 3(c)(1)(D) to read in pertinent part as follows:
Each applicant for registration of a pesticide shall file with the Administrator a statement which includes 
(D) if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted on or after January 1, 1970, in support of an application shall not, without permission of the applicant, be considered by the *558 Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by Section 10(b). This provision with regard to compensation for producing the test data to be relied upon shall apply with respect to all applications for registration or reregistration submitted on or after October 21, 1972. (Emphasis added).
25. The 1978 amendments completely rewrote Section 3(c)(1)(D) to remove the "trade secret" prohibition established by the 1972 amendments. The result of this rewriting is now embodied in Section 3(c)(1)(D). That scheme no longer prohibits the consideration of data based on its status as a trade secret but rather creates a system whereby the "age" of the data, and the "newness" of the active ingredient to which the data relates, determine the amount of protection which will be afforded. By its terms the 1978 Act established three categories of test data available for consideration by EPA under varying conditions. With respect to data submitted to support a registration application initially granted after September 30, 1978 (post-1978 data), the Administrator may not consider such data to support an application of another person (applicant), without the permission of the original data submitter, for a period of ten years following the initial registration. Therefore, data submitters are entitled to a ten-year period of "exclusive use" for post-1978 data. 7 U.S.C. § 136a(c)(1)(D)(i). With respect to data submitted after December 31, 1969 (post-1969 data), the Administrator may consider such data to support an application by another person, without the permission of the original data submitter, for a period of fifteen years following submission of the data only if the subsequent applicant has offered to compensate the original data submitter. Disputes as to compensation are submitted to binding arbitration, unreviewable by any court absent fraud or misrepresentation. An original data submitter who refuses to participate in the arbitration proceeding forfeits the right to compensation. Thus, data submitters are entitled to a fifteen-year period of compensation for use of post-1969 data. Data submitted after 1978, for which ten years of exclusive use is assured, also receives five years of compensation upon expiration of the exclusive use period. Finally, data submitted before 1970 may be considered by the Administrator to support the application of another application without the permission of the original data submitter and without an offer of compensation having been made. Chevron Chemical Co. v. Costle, 499 F.Supp. 732, 735-36, 740 (D.Del. 1980), aff'd 641 F.2d 104 (3rd Cir.), cert. denied, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981).
26. The amendments to Section 3(c)(1)(D) were enacted because Congress believed that the "trade secret" prohibition created by the 1972 amendments was a deterrent to desirable competition in the manufacture and sale of pesticide products in commerce and in practice acted as a de facto extension of the period of patent protection beyond the 17-year period established by statute. S.Rep.No. 95-334 at 3, 8, 31, U.S.Code Cong. & Admin.News 1978, p. 1966.
27. The "exclusive use" and compensation provisions in Section 3(c)(1)(D) were viewed as an appropriate reward for innovation while providing, at the same time, a fair and less expensive procedure for producing pesticide safety data. 124 Cong.Rec. § 15, 303-04 (Sept. 18 daily ed.)
28. Section 3(c)(2) of FIFRA was redesignated Section 3(c)(2)(A) by the 1978 amendments. Prior to the 1978 amendments, Section 3(c)(2) was limited by Section 10 which, in Section 10(b), absolutely prohibited the public disclosure of information containing or relating to trade secrets or confidential commercial information. Section 3(c)(2)(A) continues to be limited by Section 10, but Section 10 as amended in 1978 provides that in Section 10(b) that:

Disclosure: Notwithstanding any other provision of this Act, and subject to the *559 limitations in subsections (d) and (e) of this section the Administrator shall not make public information which in his judgment contains or relates to trade secrets or commercial or financial information obtained from a person and privileged or confidential, except that, when necessary to carry out the provisions of this Act, information relating to formulas of products acquired by authorization of this Act may be revealed to any Federal agency consulted and may be revealed at a public hearing or in findings of fact issued by the Administrator. (emphasis added).
The 1978 amendments also added a new Section 10(d) which provides in pertinent part as follows:

Limitations: (1) All information concerning the objectives, methodology, results, or significance of any test or experiment performed on or with a registered or previously registered pesticide or its separate ingredients, impurities, or degradation products, and any information concerning the effects of such pesticide on any organism or the behavior of such pesticide in the environment, including, but not limited to, data on safety to fish and wildlife, humans and other mammals, plants, animals, and soil, and studies on persistence, translocation and fate in the environment, and metabolism, shall be available for disclosure to the public. Provided, that the use of such data for any registration purpose shall be governed by Section 3 of this Act. Provided further, that this paragraph does not authorize the disclosure of any information that 
(A) discloses manufacturing or quality control processes,

(B) discloses the details of any methods for testing, detecting, or measuring the quantity of any deliberately added inert ingredient of a pesticide, or
(C) discloses the identity or percentage quantity of any deliberately added inert ingredient of a pesticide, unless the Administrator has first determined that disclosure is necessary to protect against an unreasonable risk of injury to health or the environment. (emphasis added).
29. The 1978 amendments added a new Section 10(g) prohibiting disclosure to foreign and multinational companies which provides in pertinent part as follows:
Disclosure to Foreign and Multinational Pesticide Producers. (1) The Administrator shall not knowingly disclose information submitted by an applicant or registrant under this Act to any employee or agent of any business or other entity engaged in the production, sale, or distribution of pesticides in countries other than the United States or in addition to the United States or to any other person who intends to deliver such data to such foreign or multinational business or entity unless the applicant or registrant has consented to such disclosure. The Administrator shall require an affirmation from any person who intends to inspect data that such person does not seek access to the data for purposes of delivering it or offering it for sale to any such business or entity or its agents or employees and will not purposefully deliver or negligently cause the data to be delivered to such business or entity or its agents or employees. Notwithstanding any other provision of this subsection, the Administrator may disclose information to any person in connection with a public proceeding under law or regulation, subject to restrictions on the availability of information contained elsewhere in this Act, which information is relevant to the determination by the Administrator with respect to whether a pesticide, or any ingredient of a pesticide causes unreasonable adverse effects on health or the environment.
(2) The Administrator shall maintain records of the names of persons to whom data are disclosed under this subsection and the persons or organizations they represent and shall inform the applicant or registrant of the names and affiliation of such persons.
(3) Section 1001 of Title 18 of the United States Code shall apply to any affirmation *560 made under paragraph (1) of this subsection.
30. Section 10(f) is another new section that was added by the 1978 amendments. That section establishes a criminal penalty more stringent than that provided by the Trade Secrets Act, 18 U.S.C. § 1908, for wrongful disclosure of confidential or trade secret data by a government employer or contractor. FIFRA Section 10(f), 7 U.S.C. § 136h(f).
31. The changes in 10(b), (d) were designed to further the public's right to know the basis for agency registration decisions. 123 Cong.Rec. § 13,091 (July 29, 1977 daily ed.). Also notable is the fact that a data submitter's manufacturing or quality control processes is not to be disclosed.
32. In order to support the registration of its products under FIFRA, as amended in 1978, plaintiff submits to defendant, information, research and test data of the following types: (1) efficacy studies; (2) phototoxicity studies; (3) metabolism and residue studies; (4) environmental chemistry studies; (5) toxicology studies; (6) fish and wildlife studies; and (7) manufacturing studies and information. This the data that Section 3(c)(2) as limited by Section 10, discloses. The research expended by Monsanto to provide the above data to register its products is not only time taking but involves the expertise of highly trained scientists. Monsanto utilizes sophisticated methods to adduce the necessary data, and the evidence indicated, that Monsanto is one of the leaders in the field, especially with respect to Monsanto's use of radiolabeling. Monsanto maintains that the direct historical cost incurred to develop the information, research and test data submitted by it under FIFRA to secure, maintain and expand the registration of its products is in excess of $23,600,000.00. The Court finds that figure a fair approximation of Monsanto's costs in this area.
33. Much of the information, research and test data submitted by plaintiff to the EPA under FIFRA is and has been confidentially maintained by plaintiff with stringent security measures taken to preserve its secrecy.
34. The information, research and test data developed by and submitted by plaintiff under FIFRA is used by plaintiff to develop additional formulations and to expand uses of its registered products.
35. Development of plaintiff's information, research and test data by a competitor would be extremely difficult, if at all possible, and in any event would require the exercise of highly sophisticated scientific expertise and ingenuity for thousands of man-years as well as the expenditure of enormous sums of money.
36. Disclosure of plaintiff's information, research and test data certainly enhances a competitor's ability to conduct research on identical or similar competing products and might result in the development of new products.
37. A number of other companies are, as is plaintiff, engaged in the discovery and development of pesticide products in the United States and worldwide, and these companies compete with plaintiff.
38. Pursuant to 35 U.S.C. § 134, the issuance of a patent grants the patentee the exclusive right to make, use and sell the patented invention (in this case the pesticide chemical, use, or formulation) for a 17 year period.
As previously indicated, patents on newly discovered pesticide compounds are normally applied for early in the development process and before the substantial amounts of information, research and test data submitted to support a registration are generated. The patent, if issued, does not provide protection for the research and test data submitted in support of an application for registration.
39. Upon expiration of the 17-year period of patent protection, the patent law no longer prohibits companies from making, using, or selling the formerly patented product. In the case of formerly patented pesticide chemicals, the expiration of the patent period by itself is not sufficient to allow companies to legally sell pesticide *561 products containing that active ingredient, because FIFRA requires those companies must first obtain a pesticide registration before selling their pesticide products. Under the 1972 and 1975 amendments, a data submitter could prevent a subsequent application from relying on data it had submitted to EPA and thereby prevent that applicant from obtaining a registration unless the applicant submitted his own information.
40. Monsanto frequently enjoys most of the full term of patent protection after it has initially registered a pesticide chemical. Further, new uses, manufacturing processes, formulations, or other elements important to the commercial success of the product may also be eligible for patent protection.
41. During the period of patent monopoly protection, Monsanto and other pesticide companies are also able to establish other significant competitive advantages which last beyond the period of patent protection. During the period of patent protection Monsanto is able to establish "name recognition" for its trademarks through advertising as well as the "good-will" which it receives as the only supplier of an effective product.
42. In making its decision to proceed with the development of a pesticide, Monsanto must consider a variety of factors. Included among the factors which Monsanto must consider are the availability of patent protection, the availability of raw materials, the environmental control requirements which will be imposed on the manufacture of the chemical, and the potential market for the chemical. Successful development in light of these factors can greatly enhance Monsanto's competitive advantage.
43. During the period of development of data to support an application for pesticide registration of an active ingredient, Monsanto must also secure a reliable source of raw material supplies, develop manufacturing technology and build large-scale production facilities, secure necessary environmental and other permits, develop formulations for the marketed product, and establish markets. All of these steps together require a period of several years and represent a "lead time" advantage which Monsanto enjoys over any competitor.
44. Before a "me-too" applicant can secure a registration which involves Agency consideration of Monsanto data, that applicant must supply its own formula and manufacturing process information and all the data necessary to establish that its product is actually like the Monsanto product in every relevant respect from the standpoint of applicability of the data submitted by Monsanto.
45. Monsanto is engaged in the business of manufacturing and selling synthetic fibers and chemicals. Monsanto is divided into five operating companies (units). One such unit, Monsanto Agricultural Products Company manufactures and sells pesticides. In 1980 it accounted for approximately sixteen per cent (16%) of its operating income. That substantial percentage of plaintiff's operating income is primarily due to the sales and profits of plaintiff's herbicides. The costs of research and development within the Agricultural Products Company are ordinary business expenses for tax purposes.
46. Despite the passage of the 1978 amendments to FIFRA, Monsanto continues to expand research and development and to submit extensive data to EPA.
47. Although Monsanto has refused to acknowledge the economic value to it conferred by the compensation provisions of § 3(c)(1)(D), it has received offers to pay from potential "me-too" registrants. EPA data guidelines provide the means for companies like Monsanto and "me-too" registrants to identify what kinds of studies are compensable. However, there are no discernible guidelines outlining the factors which constitute just compensation for use of Monsanto's data.
48. The data which Monsanto submits in support of its applications, although generated primarily for registration purposes, also serves other purposes including to provide information necessary to protect the *562 workers who manufacture the chemical and the researchers who test it, to use for defensive purposes in product liability lawsuits, to spur further research and development, and to obtain registrations in foreign countries.
49. Most of Monsanto's competitors in the research and development field are large foreign or multinational companies like itself. Thus, Section 10(g) of FIFRA does not directly authorize disclosure to Monsanto's foreign or multinational competitors of health and safety data otherwise disclosable to the public pursuant to Section 10(d). Still, the Court registers considerable doubt as to the effectiveness of FIFRA's disclosure provisions. Indeed, EPA all but admitted that there were certain situations in which the agency could not block the disclosure of information to multinational corporations (e.g., those multinational corporations that take over a national corporation) or foreign governments presumably even those governments unfriendly to the interests of the United States.
50. Much of plaintiff's information, research and test data that it has submitted under FIFRA to EPA and its predecessor agencies contains or relates to trade secrets as defined by the Restatement of Torts and Confidential, commercial information.
51. Plaintiff has certain property rights in its information research and test data.
52. Information, research and test data submitted under FIFRA can be evaluated by the EPA without the necessity of public disclosure.
53. Groups such as environmental organizations interested in protecting man and the environment from the effects of these dangerous pesticide chemicals, farmworkers' unions which serve to protect the interest of farmworkers who are directly exposed to the pesticides used in the fields where they work, and union groups which represent the workers in the chemical industry who manufacture pesticides, are interested in reviewing pesticide health and safety data. Indeed, many of the disclosure requests that EPA receives pursuant to Section 10 of FIFRA come from these types of groups.
54. Except for amounts of data within the manufacturing area, for example, the confidential statement of formula and the manufacturing process, the good portion of plaintiff's information, research and test data falls within that which would be disclosed to the public under Section 10 of FIFRA.
55. Defendant now has pending before her applications for registration submitted by plaintiff's competitors which will require defendant to use plaintiff's information, research and test data in order to grant them. Unless the relief sought by plaintiff is granted, defendant will use plaintiff's information, research and test data, including information, research and test data which is or contains trade secrets to grant these registrations as provided by Section 3(c)(1)(D) of FIFRA and, thereafter, will disclose such information, research and test data to members of the public as provided by FIFRA Section 10.
56. Monsanto would suffer a competitive advantage should its competitors obtain Monsanto's health and research product. The use or consideration for or disclosure to any third party by defendant of plaintiff's data will irreparably injure plaintiff in the conduct of its business and will confer an immediate and substantial competitive advantage upon its competitors, including foreign government-owned pesticide producers by eliminating the significant lead-time advantages enjoyed by plaintiff, by advancing significantly the state of such competitors' technology and by permitting the registration of their products, both in the United States and foreign countries, without their incurring the enormous expenditure of time and money for research and development which plaintiff has incurred.
57. Nothing in FIFRA Section 3 or Section 10 limits Monsanto's continued use of its research results to develop new products or new uses for old products, to advertise and market its products, to defend against legal or advertising claims adverse to the *563 product, or to enhance Monsanto's reputation in the scientific community.
58. EPA has adopted internal and published interim procedures to implement the disclosure provisions of § 10. The procedures provide a mechanism to identify persons to whom disclosure is prohibited by § 10(g). They also permit full access by data submitters to the district court review provisions of § 10 prior to release of any information claimed confidential by the submitting company.
59. Through the addition of Section 10(d), Congress has now made available for disclosure efficacy data, metabolism and residue data, environmental chemistry data, toxicology data and fish and wildlife data, regardless of whether that data qualifies as "trade secret" under the Restatement of Torts standards. In Section 10(d)(1)(A), (B) and (C), however, Congress has prohibited EPA from routinely disclosing "any information that (A) discloses manufacturing or quality control processes...."
60. The data that is available to be disclosed under Section 10(d)(1) has health and safety significance.
61. Labeling provides instructions for handling and general indications of the acute toxicity of the product, but does not elaborate the scientific basis for this information.
62. Scientific training is required to understand much of the Section 10 data because of its technical nature.
63. The EPA has the ability to obtain independent scientific review and evaluation of the information, research and test data submitted to it under FIFRA in a manner which does not compromise its confidentiality and the competitive advantage to the company which said information, research and test data provides without the necessity of public disclosure by utilizing such groups as the Scientific Advisory Panel of EPA which consists of outside scientists who are experts in certain fields including toxicology, medicine, metabolism and physiology. The Scientific Advisory Panel reviews information, research and test data presented to it by both EPA and companies and makes recommendations to EPA for actions to be taken, which EPA may or may not choose to follow.
64. In cases where an applicant was seeking a registration for a product or use not previously registered under FIFRA, USDA generally required that applicant to supply efficacy data and limited health and safety data to demonstrate that the product for which registration was sought was safe and effective when used as directed. However, the majority of the applications received by USDA, were for pesticide products and uses which were the same or substantially the same as products that had previously been registered. This type of application is commonly referred to as a "me-too" application.
65. The Pesticide Regulation Division of the USDA was divided into several branches, one of which was the Registration Branch. The Registration Branch was responsible for the review of applications for pesticide registrations. The registration branch was divided into several sections which divided the review function by types of pesticide.
66. Plaintiff's witness, Dr. Harry Hays, was director of the Pesticide Regulation Division from 1966-1969. Mr. Gregory A. Rohwer, also plaintiff's witness, was detailed to the Pesticide Regulation Division as Acting Director of that division between 1969 and 1970. Mr. Harold G. Alford was an Assistant Director of the Pesticide Regulation Division in charge of the registration branch between 1960-1970 when the pesticide registration responsibilities were transferred from USDA to EPA. At various times between 1967-1970, defendant's witness, Mr. Ray Landolt, worked in the registration branch and actually participated in the process of reviewing applications.
67. In order to carry out the established use patterns system of registration, the USDA established by regulation a list of active ingredients for which there was adequate toxicology data available to support a registration. This list, known as "Interpretation 18" was first published in 1949 and *564 was updated in 1954 and 1962. Each entry identified the active ingredient and contained information concerning the registered uses of the pesticide and its formulations as well as a sample of appropriate hazard labeling for products containing that active ingredient. This list apparently included both patented and unpatented products, including Monsanto products and the majority of data in support of these pesticide registrations was already in the public domain.
68. During the period that the USDA administered FIFRA, it was its policy that the data developed and submitted by companies such as plaintiff be maintained confidentially by the USDA and was not to be disclosed without the permission of the data submitter.
69. During the period the USDA administered FIFRA, it was also its policy that the data developed and submitted by companies such as plaintiff could not be used to support the registration of another's product without the permission of the data submitter.
70. Two former Directors of the Pesticide Regulation Division know of no instance in which any such use without permission was made. Further, if any such use without permission was made, it was contrary to the policy of the Pesticides Regulation Division. No person in the Division other than the Director had the authority to adopt or change the policy of the Division.
71. Data in the published literature or which had been developed by governmental agencies could be used by all without restriction, and for older products such as DDT this data was often sufficient to support registration without requiring the submission of data by an applicant.
72. These older products referred to in Finding of Fact No. 71 were known as "commodity" products. Examples of such products included 2, 4-D and 2, 4, 5-T.
73. Plaintiff and other companies were granted pesticide registrations for certain of these commodity products without the submission of data in support of said registration because publicly available data supported said registrations. This was consistent with the USDA policy as set forth in Finding No. 69.
74. Prior to October 21, 1972, with the exception of two registrations granted to Aceto Chemical Co., Inc., on July 17, 1972 and July 24, 1972, no competitor of plaintiff was granted a pesticide registration on other than a commodity product, based on data submitted by plaintiff.
75. Plaintiff had no knowledge of either of the pesticide registrations referred to in Finding No. 74, prior to their being granted.
76. Plaintiff was not advised of either of the applications for registration referred to in Finding No. 74, prior to their being granted.
77. The evidence in the record did not establish that at any time plaintiff had any knowledge that the policy of USDA referred to in Finding No. 69 regarding treatment of information, research and test data developed and submitted by a pesticide producer was ever violated. Further, the evidence establishes that two former Directors of the Pesticide Regulation Division were unaware of any violation of said policy.
78. The evidence establishes that if any policy other than that referred to in Finding No. 69, regarding information, research and test data developed and submitted by a pesticide producer was ever in effect at any time, such policy was never written and made available to the public or Monsanto.

Conclusions of Law
The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331(a), 7 U.S.C. § 136n(a).
In order for Monsanto to succeed in this lawsuit, it must establish the following: (1) that Monsanto has an entitlement created by federal or state law in the data it submits; (2) that EPA's use and public disclosure of said data constitutes a "taking" within the meaning of the Fifth Amendment; (3) that the compensation provisions provided by FIFRA are inadequate and *565 that a Tucker Act remedy is not available. Monsanto must prevail on each of these issues in order for declaratory and injunctive relief to be proper. The Court will employ the above analysis to each of the challenged provisions (§ 3  Use Authority), (§ 10  Disclosure Authority).
Plaintiff maintains that two grounds exist for finding its data is constitutionally protected property. First, Monsanto points to federal law where it is contended that regulations and statutes prohibited the disclosure of a registrant's research and data. Second, Monsanto looks to Missouri's protection of trade secrets as defined in § 757 of the Restatement of Torts (1939).
The evidence in this lawsuit showed that under the 1947 version of FIFRA, no regulations or statutory source authorized the disclosure of data submitted in support of an applicant's labeling claims.[1] Moreover, the Trade Secrets Act, 18 U.S.C. § 1905, provided criminal penalties for unauthorized disclosure of trade secrets by federal officers or employees. At most, the above evidence establishes only a right of non-disclosure by the EPA. None of the federal provisions relied upon by Monsanto purport to create a federal entitlement in law to the data submitted pursuant to FIFRA. The Court finds that there was no federal property right in Monsanto's research.
The crux of Monsanto's property argument is that, as interpreted by the Eighth Circuit, Missouri has recognized a property right in defendant's data through its recognition of intellectual property expressed in the Restatement definition of trade secrets.[2]Sandlin v. Johnson, 141 F.2d 660 (8th Cir.1944). Monsanto's trade secrets in the data it submitted is a separate and distinct specie of intellectual property than afforded protection by the patent laws. Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). It is well settled that property rights are "created and their dimensions are refined by existing rules or understandings that stem from an independent source such as state law." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).
Defendant does not controvert the fact that Monsanto enjoys certain property rights in its information, research and test data, however, it is defendant's position that none of these rights affect the federal government's consideration and disclosure of the data. The Court cannot agree with the EPA's characterization. The Restatement specifically prohibits disclosure of trade secrets without privilege. Internal use of Monsanto's data was never a stated risk inherent in submitting the data to EPA. While internal use by EPA does not literally involve disclosure of confidential data, it implicitly amounts, for all practical purposes, to disclosure of the data to Monsanto's competitors and the concomitant use of that data by Monsanto's competitors. The Court believes the Restatement's protection of trade secrets is intended to reach such constructive disclosure and use situations. See generally U.S. v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945) (Constitution protects every sort of interest the citizen may possess in his property). Therefore, the Court finds that Monsanto possessed a cognizable property right in the data submitted to EPA under *566 § 3 pursuant to FIFRA.[3] The property rights Monsanto possesses in its intellectual property (data) are the rights to exclude others from the enjoyment of such data in particular, the right to prevent the unauthorized use and the right to prohibit disclosure of its data.
The next question is whether the EPA's consideration and disclosure of Monsanto's pre-1969 and post-1970 data causes an unconstitutional taking of plaintiff's property.
No set formula for determining what constitutes a taking has been articulated by the Supreme Court, however, the Court has stressed certain significant factors in what is essentially a factual inquiry: (1) nature of the invasion by the government; (2) economic impact on the owner's use of the property, particularly to the extent the regulation interferes with the distinct "investment backed" expectations; (3) public program or interest designed to benefit from the regulation. Penn Central Transportation Co. v. New York, 438 U.S. 104, 124-28, 98 S.Ct. 2646, 2659-61, 57 L.Ed.2d 631 (1978); see U.S. v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 S.Ct. 609 (1941).
Section 3(c)(1)(D), which deals with agency use of Monsanto's data, does implicitly disclose plaintiff's data to its competitors. These competitors have not "contributed in money, services negotiations, skill, foresight or otherwise" to its creation. Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 78, 57 S.Ct. 364, 375, 81 L.Ed. 510 (1937). In effect, the 1978 amendments to FIFRA give Monsanto's competitors a free ride at Monsanto's expense. The fundamental right of Monsanto and its property  the right to exclude  is appropriated by § 3(c)(1)(D). See Kaiser Aetna v. U.S., 444 U.S. 164, 179-80, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979). Moreover, the economic impact of § 3(c)(1)(D) is substantial and impairs Monsanto's "investment backed" expectations.
The Court also finds that § 3(c)(1)(D) unabashedly operates to further a private purpose. Internal use of Monsanto's data can only enrich its competitors. The public stands little to gain from § 3(c)(1)(D). This is not a situation where competition is sparse or non-existent, to the contrary, the trial record amply demonstrates the competition and the pesticide industry as healthy and vibrant.
The Court is aware of the deference which must be shown Congressional pronouncements of what constitutes a public purpose. Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). Nevertheless, the Court would be abdicating its responsibility to follow the Constitution if it did not rationally analyze laws which, in the name of public policy, mandate the forced sharing of property and markets created by one person for the benefit of private parties. Thompson, 300 U.S. at 78-79, 57 S.Ct. at 375; U.S. v. Carolene Products, 304 U.S. 144, 147, 58 S.Ct. 778, 780-81, 82 L.Ed. 1234 (1938).
Section 3(c)(1)(D)'s interference with Monsanto's property is significant in comparison to the purported public good to be served. The EPA's internal use of Monsanto's property to support the registrations of Monsanto's competitors is not merely a change in the general law, but a destruction and therefore a taking of Monsanto's property.
Section 10 authorizes the public disclosure of test data and such matters as the effects of pesticides on human, plant and animal life. This information is initially scrutinized by the EPA (which has available to it all the scientific resources of the federal government and also of many private foundations and consultants it may choose) to determine whether the submitted product is safe and effective. The presence of a registered *567 product on the market is in itself evidence that the EPA has satisfied itself that the statutory objectives of FIFRA have been met. Furthermore, the product's label provides fair information as to what is being sold and fairly sets forth the nature, contents and purpose of the product.[4] Therefore, the product's label provides the public with the assurance that the product is safe and effective and with the knowledge of the product's qualities. All that is accomplished by publicly disclosing the various data (property) submitted by Monsanto is to permit the public to share in the regulation of the pesticide industry. The cost of this "sharing" is that Monsanto's data is permanently committed to the public domain and thus effectively destroyed.
The Court cannot fairly say that Section 10's public disclosure provisions are a regulation of commerce. The public interest in seeing that safe and effective products are marketed is satisfied by the EPA's painstaking analysis of the complicated data submitted by Monsanto to register its products. The product's label effectively conveys the information the public needs to make an informed decision. Public disclosure of Monsanto's data by operation of § 10 is beyond Congress' regulatory powers and constitutes a taking of Monsanto's property. If Congress desires to exercise its power of eminent domain, which it has done in this case, and such power must be exercised in light of the due process protections afforded by the Fifth Amendment. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935).
The next issue raised is whether the compulsory binding arbitration scheme envisioned by § 3(c)(1)(D)(ii) is adequate to compensate Monsanto for the property taken by operation of FIFRA. Under the arbitration scheme of § 3(c)(1)(D)(ii) Monsanto is forced to either conclude a compensation agreement with a "me-too" applicant or take its chances with binding arbitration. Monsanto's failure to either reach an agreement with a "me-too" applicant or to submit to arbitration forfeits Monsanto's right to compensation and its property.
The Court initially notes that judicial review of an arbitrator's decision (Federal Mediation and Conciliation Service) is all but denied in except a few cases involving fraud. Equally important is the absence of a formula of a guidance on the evaluation of data for compensation purposes.
The Court finds the arbitration provision of § 3 arbitrary and vague. Not only are the arbitrators given no guidance as to the factors which make up just compensation, but judicial review of an arbitrator's decision, which may result in a confiscatory taking, is foreclosed. All of this is done without Monsanto's assent, see N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937).
In the Court's view, the arbitration scheme does not afford Monsanto just compensation and constitutes a denial of due process in violation of the Fifth Amendment. See Baltimore & O.R.R. v. U.S., 298 U.S. 349, 357, 363, 368, 56 S.Ct. 797, 802, 805, 807, 80 L.Ed. 1209 (1936). The arbitration scheme also delegates judicial power to determine property rights disputes without the necessary prerequisites of Article 3 of the Constitution. See U.S. v. Security Industrial Bank, ___ U.S. ___, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982); Northern Pipeline Const. Co. v. Marathon Pipeline Co., ___ U.S. ___, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).
The final issue presented is whether the Tucker Act is available to provide Monsanto with adequate compensation for the taking of Monsanto's property rights. The Court's initial inquiry focuses on "not whether the (challenged statute) expresses an affirmative showing of congressional intent *568 to permit recourse to the Tucker Act remedy" but rather whether Congress has "withdrawn the Tucker Act grant of jurisdiction to the Court of Claims to hear a suit involving the (challenged statute) founded upon ... the Constitution." Regional Rail Reorganization Cases, 419 U.S. 102, 126, 95 S.Ct. 335, 349-50, 42 L.Ed.2d 320 (1974). In the Rail Act Cases, the court analyzed the relevant acts and determined the Tucker Act remedy was available. Crucial to the court's analysis was the court's belief that the money allocated under the Act to provide compensation was intended to satisfy the constitutional standard of just compensation.
A fair reading of FIFRA indicates that the "benefits" (compensation and exclusive use) afforded by § 3 were intended to be the sole compensation for any taking effectuated by §§ 3(c)(1)(D) and 10. The compensation scheme set up by FIFRA rests on the theory that since the date of the original submitter is utilized for the private benefit of a competitor  rather than the United States  then the competitor should pay the original data submitter. No monies were allocated by the government to insure that adequate compensation would occur. It is clear that this scheme purportedly acts to completely compensate Monsanto for property taken immediately by the de facto exercise of eminent domain accomplished by operation of FIFRA. See Rail Cases, 419 U.S. at 149-50, 95 S.Ct. at 361 (cautioning that it might be inconsistent to suppose that a Tucker Act suit would lie for the entire value, in cash, of rail properties).
The Court finds that the Tucker Act remedy is not available to Monsanto for the deprivation caused by §§ 3 and 10 of FIFRA. The case at bar concerns an immediate taking of Monsanto's property as of the passage of the amendments to FIFRA on September 30, 1978. The compensation scheme, as presently embodied in § 3(c)(1)(D)(ii) is vague and uncertain and in effect provides Monsanto with no compensation whatsoever. To suppose that Monsanto would have to endlessly petition the Court of Claims every time the EPA uses or discloses its property is contrary to the purposes of the Tucker Act which is intended to award a sum of money to remedy a wrong in whole and with finality. Moreover, the Court of Claims cannot provide the necessary declaratory and injunctive relief which Monsanto must have.
The Court is aware that its decision is contrary to that of a number of other federal courts. See e.g., Mobay Chemical Co. v. Costle, 517 F.Supp. 252 (W.D.Pa.1981), aff'd sub nom Mobay Chemical Co. v. Gorsuch, 682 F.2d 419 (3rd Cir.), cert. denied, ___ U.S. ___, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982); Penwalt Corp. v. EPA, No. 80-2400 (E.D.Pa., July 17, 1981), aff'd Mobay, supra; Chevron Chemical Co. v. Costle, 499 F.Supp. 732 and 499 F.Supp. 755 (D.Del.1980), aff'd 641 F.2d 104 (3rd Cir.), cert. denied 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981); Petrolite Corp. v. EPA, 519 F.Supp. 966 (D.D.C.1981). The Court deviates from these decisions because, in most of the above cited decisions, the courts summarily found that a property right did not exist in data similar to that of Monsanto and, therefore, the courts necessarily did not analyze the 1978 amendments to FIFRA in their entirety. After reviewing the operation of FIFRA and its impact upon Monsanto's protected property rights, the Court is convinced that Congress exceeded its regulatory authority and violated the Fifth Amendment of the United States Constitution when in 1978 it amended §§ 3(c)(1)(D) and 3(c)(2)(A) and 10(b) and 10(d) of FIFRA.

JUDGMENT
After a trial on the merits, wherein the Court carefully considered the evidence presented, the legal arguments proffered by the parties and the applicable law,
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that §§ 3(c)(1)(D), 3(c)(2)(A), 10(b) and 10(d) of the Federal Insecticide, Fungicide and Rodenticide Act, as amended by the Federal Pesticide Act of 1978, 7 U.S.C. § 136 et seq., are unconstitutional and unlawful and that they are beyond any power conferred by *569 Congress by Article I, § 8, Clause 3 of the Constitution of the United States and are in violation of the Fifth Amendment thereto;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant, his officers, agents, employees and representatives be and they are hereby PERMANENTLY ENJOINED from the implementation and enforcement, in any manner, directly or indirectly, of §§ 3(c)(1)(D), 3(c)(2)(A), 10(b) and 10(d) of the Federal Insecticide, Fungicide and Rodenticide Act, as amended by the Federal Pesticide Act of 1978; and
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that § 3(c)(1)(D) of the Federal Insecticide, Fungicide and Rodenticide Act, as amended by the Federal Pesticide Act of 1978, does not authorize the defendant to use or consider in support of another's application for registration any of plaintiff's information, research and test data submitted prior to January 1, 1970, and such use and consideration thereof by defendant without plaintiff's express written permission is unlawful; and
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant, his officers, agents, employees and representatives be and they are hereby PERMANENTLY ENJOINED from any use or consideration for or disclosure to any other person of any of plaintiff's information, research and test data, whenever submitted to defendant or his predecessors, unless defendant shall have first obtained plaintiff's express written permission.
IT IS FURTHER ORDERED that a Memorandum Opinion detailing the findings of fact and conclusions of law in support of this Judgment shall issue within six (6) days of this Judgment.
NOTES
[1] Nevertheless, it was not until the 1972 Amendments to FIFRA that provisions in FIFRA itself restricted the EPA's ability to consider one company's data in support of another company's application. See FF 22.
[2] § 757 provides:

One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
(a) he discovered the secret by improper means, or
(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or
(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or
(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake.
[3] It follows that if Monsanto had a property interest in preventing the internal use of its data by the EPA, then a property interest certainly attached in the non-disclosure of said data by the EPA. Both the Restatement, Trade Secrets Act, and prior agency practice demonstrate that Monsanto could reasonably expect that its data would be kept confidential and would not enter the public domain.
[4] The Supreme Court's opinions in Corn Products Refining Co. v. Eddy, 249 U.S. 427, 39 S.Ct. 325, 63 L.Ed. 689 (1919) and National Fertilizer Association v. Bradley, 301 U.S. 178, 7 S.Ct. 748, 81 L.Ed. 990 (1937), which dealt with the constitutionality of the government's police power to require proper labeling, are inapposite because labeling is provided with the products and the EPA has already determined the products safe and effective.