UNION CARBIDE AGRICULTURAL PRODUCTS CO., INC., et al., Plaintiffs,

v.

William D. RUCKLESHAUS, as Administrator of the United States Environmental Protection Agency, et al., Defendants.

No. 76 Civ. 2913 (RO).

United States District Court, S.D. New York.

July 28, 1983.

McKenna, Conner & Cuneo, Washington, D.C., Arthur, Dry & Kalish, New York City, for plaintiffs; John D. Conner, Kenneth W. Weinstein, Robert A. Anthony, Washington, D.C., Sidney P. Howell, Alan C. Zetterberg, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendants; Michael H. Dolinger, Asst. U.S. Atty., New York City, Marcia Mulkey, Environmental Protection Agency, Washington, D.C., of counsel.

## OPINION AND ORDER

OWEN, District Judge.

This action arises out of a challenge to the constitutionality of certain aspects of the 1978 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y. Specifically, plaintiffs object to the requirement that they disclose their testing data to the public (the "disclosure" provisions) and a second requirement that allows competitors to use such data in support of their own pesticide registrations (the "use" provisions). De-

fendant is the administrator of the United States Environmental Protection Agency (the "EPA"). The parties are presently before me on cross-motions for summary judgment. Before I turn to the merits, a review of the statutory history is appropriate.

In 1947, Congress enacted the forerunner of today's FIFRA. At inception, the statute simply required the developer or manufacturer of a pesticide to register its product with the Secretary of Agriculture prior to introducing it into the marketplace. The registration process itself was relatively straightforward. An applicant was required to file its name and address, the name of the pesticide to be registered, a complete copy of the labeling and a statement of the claims made for it, including directions for use, and, if requested by the Secretary, a full description of the tests made and the results upon which any claims were based. The Secretary was also vested with the power to require an applicant to submit the complete formula of its pesticide. If it appeared that its composition was such as to warrant the proposed claims made for it and if it otherwise conformed with the requirements of FIFRA, after reviewing the data submitted, the Secretary registered the pesticide. If the Secretary was dissatisfied with the application, the applicant would be provided with notice and an opportunity to correct its deficiencies.

FIFRA was substantially revised in 1972: as a response to growing public concern about public health and ecological effects of pesticides. The new FIFRA provided for a more complete registration process and stronger enforcement measures, and heralded a policy of thorough scientific analysis of pesticide chemicals before making them available to the public. Now ... not only does an applicant for registration have to show his pesticide's composition is such as to warrant the proposed claims made for it and that its labeling and other submitted materials comply with the Act before he may obtain a registration but the EPA must also determine that the pesticide will perform its intended function without unreasonable adverse effects on the environment, and that, when used in accordance with widespread and commonly recognized practice, it will not generally cause adverse effects on the environment.

*Mobay Chemical Corp. v. Costle,* 517 F.Supp. 254, 258 (W.D.Pa.1981) *aff'd in part sub. nom. Mobay Chemical Corp. v. Gorsuch,* 682 F.2d 419 (3rd Cir.1982).

The 1972 amendments still required persons applying to register pesticides to submit extensive testing data in support of their registrations but allowed them to retain certain proprietary rights in their data even after submission. To this end, former section 10(a) permitted data submitters to designate portions of their data as either trade secrets or commercial or financial information, and former section 10(b) prohibited the EPA from disclosing those portions.

The 1972 amendments also allowed data submitters certain rights of compensation. Thus, the EPA was prohibited from using publicly available data it had received in support of one pesticide registration to support the registration of another pesticide unless the subsequent data user first offered to pay reasonable compensation to the original data submitter. Where possible, the level of compensation was to be negotiated by the original data submitter and the data user. Where agreement could not be reached, the EPA retained the power to set the level of compensation. The original data submitter, however, retained the right to appeal this determination to the federal district court.

Such a compensated use program had benefits for both the EPA and for registrants. It increased administrative efficiency by allowing the EPA to rely on already approved testing techniques and it benefited original data submitters by mandating compensation when their data was used by another registrant.

The 1978 amendments to FIFRA were enacted in response to certain problems which had arisen following the enactment of the 1972 revisions. Among these difficulties was the practice adopted by many

data submitters of designating large portions of their data as "trade secret" material in order to avoid subsequent disclosure. Obviously, this tactic precluded the EPA's use of their data to support the registrations of competing pesticide manufacturers. As a result, the trade secret provisions both limited the EPA's efficient management of its registration process and undercut the compensation program envisioned by the drafters.

Pursuant to the 1978 amendments, all applicants are no longer required to make the extensive filings previously mandated. Rather, applicants must now file either "a full description of the tests made and the results thereof upon which the claims are based or, alternatively, a citation to data that appear in the public literature or that previously had been submitted to the Administrator . . . ." 7 U.S.C. § 136a(c)(1)(D).

Moreover, although the original data submitter still retains certain proprietary rights in the data which it has submitted, those rights have been significantly altered. New section 3(c)(1)(D) no longer permits a data submitter to invoke trade secret protection. 7 U.S.C. § 136a(c)(1)(D). Rather, it divides all submitted data into three parts. Thus,

(1) *with respect to pesticides containing active ingredients that are initially registered after September 30, 1978,* the original data submitter is entitled to a period of exclusive use of that data for registration purposes for a period of 10 years;

(2) *with respect to data submitted after December 31, 1969 and not subject to the exclusive use provisions set forth above,* the EPA may use such data in its consideration of the registration applications of applicants other than the original data submitter for a period of 15 years if the applicant has made an offer to compensate the original data submitter. The terms and amounts of compensation are to be set by the parties themselves. Should they fail to reach agreement on compensation, either party may initiate binding arbitration proceedings. The arbitrator's findings and determinations are

not reviewable by the federal courts except for fraud, misrepresentation, or other misconduct; and

(3) *with respect to data which is not subject to either the exclusive or the compensated use provision,* the EPA may use data provided by an original data submitter in support of the registration of another applicant without the permission of the original submitter and without an offer of compensation being made.

In sum, the new program allows the developer of new "active ingredients" the exclusive use of its data for a period of ten years and compensated use for a period of five years following the termination of the exclusive use period. It allows registrants of data not qualifying for a period of exclusive use a fifteen-year period of compensated use. And finally, it provides for neither exclusive nor compensated use fifteen years after registration.

In addition to these new use provisions, the 1978 amendments impose new disclosure requirements on registrants. As I mentioned above, under the earlier law registrants were allowed to shield much of their filed data by designating portions thereof as trade secrets. The new section 10(d), 7 U.S.C. § 136h(d), "authorizes the public disclosure of all information concerning the objectives, methodology, results, or significance of any test performed on or with a pesticide, and of any residue, environmental chemistry, safety, toxicology, metabolism, and fish and wildlife data." *Mobay Chemical Corp. v. Costle, supra,* 517 F.Supp. at 260. Three significant classes of information, however, remain protected from disclosure "unless the Administrator has first determined that disclosure is necessary to protect against an unreasonable risk, or injury to health or environment," 7 U.S.C. § 136h(d)(1):

(A) [information that] discloses manufacturing or quality control processes,

(B) [information that] discloses the details of any methods for testing, detecting, or measuring the quantity of any deliberately inert ingredient of a pesticide, or

(C) [information that] discloses the quantity of any deliberately added inert ingredient of a pesticide.

7 U.S.C. § 136h(d)(1). The use of data made available pursuant to this section for purposes of registration is governed by § 3(c)(1)(D), as set forth above.

In their complaint, plaintiffs attack two aspects of the 1978 FIFRA amendments. First, plaintiffs challenge new section 10 of FIFRA, 7 U.S.C. § 136h—the "disclosure" provision—which allows the EPA to disclose certain information to the public which had been submitted by plaintiffs prior to 1978 and which prior to that date had been insulated from public disclosure by the trade secret protections of the predecessor act. Plaintiffs contend that this disclosure provision is a retroactive deprivation of plaintiffs' property rights in their trade secret data in violation of due process of law. Second, plaintiffs challenge new section 3(c)(1)(D) of FIFRA, 7 U.S.C. § 136a(c)(1)(D)—the "use" provision— which permits the compensated use of plaintiffs' research data by other registrants to support their own federal pesticide registrations. Plaintiffs contend that the compensated use requirement, coupled with the particular arbitration remedy provided in the statute, is improper as an unconstitutional delegation of legislative power to the private arbitrators and, alternatively, is a violation of the Constitution insofar as it deprives the judiciary of its traditional Article III function.

Defendant, by its cross-motion for summary judgment, contends that these sections withstand constitutional scrutiny. I first consider the "disclosure" provision before turning to the "use" section.

*The Disclosure Requirement* [1]

■ As the preceding discussion indicates, prior to 1978, after submitting data in support of their products, pesticide registrants could then designate certain portions of their submissions as trade secret material. Once so designated, data was protected from disclosure by former section 10(b). The 1978 amendments, however, introduced a new program which strongly favors disclosure. Pursuant to new section 10(d), "all information concerning the objectives, methodology, results or significance of any test or experiment" submitted in support of a registration is subject to disclosure except insofar as that information may be protected by certain narrowly drawn exceptions. Thus, the new program affects all data in one of two ways. As to data submitted after the passage of the 1978 amendments, pesticide registrants are on notice that they are relinquishing their expectations to trade secret protection except as narrowly preserved by the statute itself. As to data submitted prior to 1978, the amendments operate more onerously. The expectation fostered by the pre-1978 statute that data designated as trade secret material will be withheld from public disclosure no longer obtains. Only so much of the once-protected data as falls within the statutory exception remains protected from disclosure. The rest, even though it was once secret and even though it may have been submitted with the expectation that it would not be disclosed, is publicly available.

Plaintiffs challenge the retroactive effect of the 1978 amendments to section 10, 7 U.S.C. § 136h(d), and claim that the pre-1978 statute created the expectation that data designated "trade secret" would be preserved from disclosure and that this expectation fostered by statute constituted a "vested right." Plaintiffs further contend that the retroactive deprivation of this expectation divests them of their property without due process of law. They contend in addition, that this "retroactive application is so harsh and oppressive as to transgress the constitutional [due process] limitation." *Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 126, 83 L.Ed. 87 (1938).

---

1. Plaintiffs have requested that the court postpone determination of this aspect of the motions because of the pendency of proposed legislation which would restructure the disclosure provisions in the statute. Insofar as that legislation does not appear to be substantially closer to enactment today than it was on the day that plaintiffs first made their request, that application is denied.

Plaintiffs do not contest the new disclosure requirements as they apply to data submitted after the enactment of the 1978 amendments. As the Supreme Court commented in an analogous context:

> [I]t is too plain for argument that a manufacturer or vendor has no constitutional right to sell goods without giving to the purchaser fair information of what it is that is being sold. The right of a manufacturer to maintain secrecy as to his compounds and processes must be held subject to the right of the state, in the exercise of its police power and in promotion of fair dealings, to require that the nature of the product be fairly set forth.

*Corn Products Refining Co. v. Eddy,* 249 U.S. 427, 431–32, 39 S.Ct. 325, 327, 63 L.Ed. 689 (1919); *see, also, National Fertilizers Ass'n v. Bradley,* 301 U.S. 178, 57 S.Ct. 748, 81 L.Ed. 990 (1937). "Further, [l]egislative acts adjusting the burdens and benefits of economic life come . . . with a presumption of constitutionality, and . . . the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). Even legislation that has retroactive applicability "is not unlawful solely because it upsets otherwise settled expectation." 428 U.S. at 16, 96 S.Ct. at 2893. "The retroactive aspects [however] must meet the test of due process, and the justifications for the latter may not suffice for the former." 427 U.S. at 17, 96 S.Ct. at 2893. Thus, the constitutionality of the disclosure provisions must be judged by the standard due process test. If the challenged legislation bears a rational relation to the evil which it seeks to remedy, I may look no further. *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).

I conclude that the disclosure requirements embodied in section 10(d), 7 U.S.C. § 136h(d), are neither arbitrary nor irrational. FIFRA was revised in 1972 to accommodate the increasing public interest in the regulation of products which affect the environment with the interest of pesticide manufacturers in protecting costly research data from acquisitive competitors. FIFRA was amended again in 1978 to adjust the balance struck in 1972 when it became apparent that the statutory goal of granting the public access to the data from which they could conduct their own evaluations of new pesticides fell short of achievement by reason of registrants' ability to designate certain portions of their data as trade secrets. That the amendments could have been better drawn or if they upset settled expectations, is of no consequence. The Constitution does not require perfect economic regulation. It only requires that legislation not be arbitrary or irrational. The disclosure provisions meet that standard. Defendant's motion for summary judgment on this issue is therefore granted.

### The Compensation-Arbitration Provisions [2]

Plaintiffs also challenge the compensation provisions of the amended stat-

---

**2.** Defendant contends that plaintiffs' challenge to the arbitration provisions in FIFRA are premature and that plaintiffs lack standing. I disagree and hold that they have presented a justiciable "case or controversy."

In order to demonstrate standing, a claimant must show "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595. That second component may also be determined by resolving "whether the interest sought to be protected is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

In this instance, the inquiry therefore focuses on whether plaintiffs are suffering injury in fact by the operation of the arbitration requirements and whether "there is a 'substantial likelihood' that the relief requested will redress the injury claimed." *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. at 75 n. 2, 98 S.Ct. at 2631 n. 2. Plaintiffs here would describe their alleged injury in terms of the statutory compulsion to participate in an arbitration procedure that is void *ab initio* as a matter of law and the deprivation thereby of any access to meaningful compensation for the use of their data by subsequent registrants.

ute. Section 3(c)(1)(D), 7 U.S.C. § 136a(c)(1)(D),[3] the focus of plaintiffs' complaint, calls for the data user, in the first instance, to make a compensation offer. If the data submitter does not accept that offer within 90 days and the parties

The Constitution requires only that the plaintiffs allege a "distinct and palpable injury" to satisfy the first component of the test. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). The compulsion to arbitrate satisfies that component. Moreover, the second component is more easily satisfied. Where the Constitution requires only "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct," *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. at 72, 98 S.Ct. at 2630, *quoting Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977), plaintiffs' injuries here would be the direct product of the statutory plan. Plaintiffs are clearly within the zone of interest regulated by the use provisions.

Defendants also contend that plaintiffs' challenge to arbitration is not yet ripe for judicial review, *i.e.,* whether an abstract or a concrete question is before the court. "The difference between an abstract question and a 'case or controversy' is one of degree, of course, and is not discernible by any precise test." *Babbitt v. United Farm Workers,* 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). Here that question is best settled by inquiring into what profit there would be in the court's waiting for a later date. Defendant contends that this action will not be ripe for resolution until arbitration has produced results unfair to plaintiffs or at least until arbitration has been commenced. Nevertheless, it is not the results of any arbitration procedure that plaintiffs protest, or even the internal procedure thereof, rather it is the statutory compulsion to seek relief through arbitration to the exclusion of any other mechanism. That issue is clearly ripe for resolution.

3. Section 3(c)(1)(D) states, in pertinent part: Each applicant for registration of a pesticide shall file with the Administrator a statement which includes . . .
(D) . . . a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Administrator may consider in accordance with the following provisions:
(i) With respect to pesticides containing active ingredients that are initially registered under this subchapter after September 30, 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use to the registration and that pertains solely to such new use, shall not without the written permission of the original data submitted, be considered by the Administrator to support an application by another person during a period of ten years following the date the Administrator first registers the pesticide:
Provided, That such permission shall not be required in the case of defensive data;
(ii) except as otherwise provided in subparagraph (D)(i) of this paragraph, with respect to data submitted after December 31, 1969, by an applicant or registrant to support an application for registration, experimental use permit, or amendment adding a new use to an existing registration, to support or maintain in effect an existing registration, or for re-registration, the Administrator may, without the permission of the original data submitter, consider any such item of data in support of an application by any other person (hereinafter in this subparagraph referred to as the "applicant") within the fifteen-year period following the date the data were originally submitted only if the applicant has made an offer to compensate the original data submitter and submitted such offer to the Administrator accompanied by evidence of delivery to the original data submitter of the offer. The terms and amount of compensation may be fixed by agreement between the original data submitter and the applicant, or, failing such agreement, binding arbitration under this subparagraph. If, at the end of ninety days after the date of delivery to the original data submitter of the offer to compensate, the original data submitter and the applicant have neither agreed on the amount and terms of compensation nor on a procedure for reaching an agreement on the amount and terms of compensation, either person may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct.

have not agreed on a procedure to determine compensation, either the data user or the data submitter may then initiate binding arbitration proceedings. The statute, however, sets no guidelines or standards for the fixing of compensation. Moreover, it provides that "the findings and determination of the arbitrator shall be final and conclusive" and that

> no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator....

■ Plaintiffs challenge the constitutionality of this provision on two grounds.[4] First, they contend that the compensation-arbitration procedure is an unlawfully overbroad delegation because it (1) contains no standards for decision-making, (2) fails to set forth any system through which coherent standards can be developed, and (3) restricts sufficient access to judicial or administrative review. *See Schecter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). And second, they contend that the arbitration-compensation procedure impermissibly intrudes on areas of decision-making constitutionally entrusted to the judiciary. *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). While plaintiffs appear correct in their contention that this is a standardless delegation of powers, what is dispositive here is the fact that the proposed arbitration procedure commits to arbitrators the power to resolve valuation issues utterly without judicial review. This absolute assignment of power to arbitrators is an impermissible intrusion on the judiciary.

In *Northern Pipeline,* the Supreme Court held that although the Congress possesses substantial discretion to create substantive federal rights and to tailor the manner in which they may be adjudicated, including the assignment to an adjunct of some functions historically performed by judges ...[,] the functions of the adjunct must be limited in such a way that 'the essential attributes' of judicial power are retained in the Art. III court." 458 U.S. at 81, 102 S.Ct. at 2876. There can be no question that on its very face § 3(c)(1)(D) fails to abide by this limitation. *Accord, Monsanto Company v. Acting Administrator,* 564 F.Supp. 552 (E.D.Mo.1983).

The use-compensation system utterly deprives the federal courts of any meaningful role in ensuring the provision of fair compensation to data submitters. The courts play no role in fact-finding. More importantly, however, they are barred from considering any matters of law arising from the substantive issues in dispute in an arbitration proceeding. Rather, their powers are limited to review for "fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator." This leaves the courts with no power to make any "informed, final determination" of a data submitter's right to compensation. Such an assignment of powers to arbitrators cannot be sustained in the face of Article III.

Submit order on notice effectuating the foregoing.

---

4. Courts confronted with the questions whether there is a property right in submitted testing data and whether, if there is, the statutory program constitutes a "taking" have reached differing conclusions. *Compare Monsanto Company v. Acting Administrator,* 564 F.Supp. 552 (E.D.Mo.1983), *with Mobay Chemical Corp. v. Gorsuch,* 682 F.2d 419 (3rd Cir.1982), *affirming in part, Mobay Chemical Corp. v. Costle,* 517 F.Supp. 254 (W.D.Pa.1981), *with Petrolite Corp. v. EPA,* 519 F.Supp. 966 (D.D.C. 1981); *cf., Union Carbide Agricultural Products Co., Inc. v. Costle,* 632 F.2d 1014 (2d Cir.1980).