**PPG INDUSTRIES, INC., Plaintiff,**

v.

**STAUFFER CHEMICAL CO., Lee M. Thomas, Administrator, U.S. Environmental Protection Agency, and Kay McMurray, Director, Federal Mediation and Conciliation Service, Defendants.**

**Civ. A. No. 83–1941.**

United States District Court,
District of Columbia.

June 2, 1986.

Thomas H. Truitt, Washington, D.C., for plaintiff.

Lawrence S. Ebner, Washington, D.C., for Stauffer.

Lawrence Liebesman, Land and Natural Resources Div., U.S. Dept. of Justice, Marcia Mulkey, Washington, D.C., for E.P.A.

## MEMORANDUM OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on the motion of plaintiff for summary judgment and the motion of defendant Stauffer Chemical Company (Stauffer) to dismiss, or in the alternative, for summary judgment as to Counts I–IV. The Court denies plaintiff's motion for summary judgment, and grants Stauffer's motion to dismiss Counts I–IV of the complaint.

### Background

This case involves an arbitration award issued under the arbitration procedure established by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136 *et seq.* (1982). FIFRA commits to private arbitrators the authority to determine the amount of compensation a "me-too" pesticide licensee must pay to the original licensee of the pesticide (here, a pesticide containing the active ingredient butylate).

Plaintiff asks this Court to vacate the arbitrators' award. Plaintiff argues in Count I of its complaint that the award is void as arbitrator "misconduct" because the arbitrators failed to apply the proper standard in determining compensation. In Count II, plaintiff alleges that this same failure amounts to a denial of due process. Counts III and IV concern the constitutional validity of the statute itself; plaintiff argues that the arbitration statute is in violation of Article III and the Fifth Amendment. Both of these arguments have been mooted by recent decisions of the Supreme Court, *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) and *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. ——, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). In Counts V and VI, plaintiff argues that the Court should vacate the award because of Stauffer's alleged fraud or misrepresentations concerning the evidence presented to the arbitrators.

As Counts III and IV are moot, and Counts V and VI are not addressed in these motions, the issues presented to the Court are limited: whether FIFRA provides a standard of compensation, and, if so, whether it is "misconduct" or a violation of due process for arbitrators to fail to apply that standard. Because the Court discerns no standard in the statute, it is unnecessary to reach the latter two issues. The Court finds that Stauffer is entitled to dismissal of Counts I–IV of the complaint.

### Statutory Background

Since the enactment of FIFRA in 1947, pesticide manufacturers have been required to register their products, originally with the Department of Agriculture and,

since 1970, with the Environmental Protection Agency (EPA), before distribution or sale in interstate commerce. *See* 7 U.S.C. § 136a (1982). Under FIFRA § 3(c)(5), an applicant must demonstrate, *inter alia,* that its pesticide will not cause "unreasonable adverse effects on the environment." *Id.* § 136a(c)(5). Additionally, for pesticides that may leave a residue on food crops, the applicant must obtain a tolerance from EPA. 21 U.S.C. § 346(a). To make these showings, applicants conduct tests on their products and submit the results to EPA. 7 U.S.C. § 136a(c)(1)(D).

Section 3(c)(1)(D)(ii) of FIFRA is a "mandatory data—licensing" provision. *Monsanto Co.,* 467 U.S. at 992, 104 S.Ct. at 2868. However, subsequent applicants for registration for a particular pesticide may under these provisions use the original registrant's research data to obtain a "me-too" registration.

"Me-too" registrations are only available under § 3(c)(1)(D)(ii) where "the applicant has made an offer to compensate the original data submitter." 7 U.S.C. § 136a(c)(1)(D)(ii). If the parties cannot agree on the "amount and terms of compensation," either party "may initiate binding arbitration proceedings." *Id.* The proceedings are conducted by private arbitrators under the auspices of the Federal Mediation and Conciliation Service (FMCS). Under § 3(c)(1)(D)(ii), the decision of the arbitrators is final and subject only to judicial review for "fraud, misrepresentation, or other misconduct."

### Standard of Compensation

The general scope of the arbitrators' duty under FIFRA is clear. The arbitrators are to determine the amount of compensation due an original licensee when a second licensee registers the same pesticide without producing its own test data. The dispute over standards arises in attempting to define what factors the arbitrators may consider in compensating the original licensee, or what sort of formula the arbitrators are to apply.

Plaintiff argues that a cost-sharing standard of compensation is required. Plaintiff seeks a ruling that the arbitrators are limited in their awards to compensating the original licensee for the actual cost of producing the test data relied upon by the later licensee. The award at issue in this case awarded Stauffer one-half of its direct aggregate testing cost ($1,465,000) plus a running royalty of 15 cents on every pound of butylate sold by plaintiff from 1983 to 1992 (subject to certain adjustments). *Award* at 18–19, 22. Under plaintiff's cost-sharing standard the latter half of the award would be *ultra vires* as it purportedly compensates Stauffer for the benefit of early market entry conferred on plaintiff, and for plaintiff's incorporation of Stauffer's product labels and use instructions. *Id.* at 11–12, 15.

Stauffer, on the other hand, takes the position that no particular standard or formula is mandated under the statute; the arbitrators are free to consider any factors they deem relevant in determining the amount of compensation due. Each case is to be decided independently of all other cases.

■ Considering the statute and its legislative history, the Court is persuaded that Stauffer's position is correct. Congress intentionally left to the arbitrators the choice of what formula to use in determining compensation.

### 1. *The Statute*

As the Supreme Court has observed, "FIFRA's language does not impose an explicit standard" for compensation. *Union Carbide,* 105 S.Ct. at 3340. Indeed, in 1978 Congress amended the statute so as to remove all suggestion of a standard. The 1972 and 1975 versions of the data compensation provision required the "me-too" registrant "to pay reasonable compensation for producing the test data to be relied upon." Pub.L. No. 92–516, 86 Stat. 973, 980 (1972); Pub.L. No. 94–140, 89 Stat. 751, 755 (1975). In 1978, Congress removed the term "reasonable" and the phrase "for producing the data to be relied upon" from the

data compensation provision, rendering the statute completely neutral as to how compensation was to be determined.

## 2. *The Legislative History*

The legislative history of the data compensation provision suggests why Congress removed all reference to a standard from § 3(c)(1)(D)(ii) and referred the matter to arbitration in the 1978 amendments. The EPA had been struggling unsuccessfully to determine an appropriate formula; Congress apparently reached the conclusion that no such formula could be devised, and decided that private, expert arbitrators ruling on a case-by-case basis would provide the best approximation of appropriate compensation.

As originally enacted in 1947, FIFRA was a licensing and labeling statute. In 1972, Congress passed the Federal Environmental Pesticide Control Act of 1972, 86 Stat. 973, the purpose of which was to increase competition and decrease costs by avoiding some duplication of test data. *Union Carbide*, 105 S.Ct. at 3328. In order to encourage research and development, Congress provided for compensation to the original data submitter. *Id.* 105 S.Ct. at 3329. Compensation was to be negotiated by the parties, and, if those negotiations failed, compensation was determined by the EPA.

The EPA found this task to be beyond its means.

[T]here are so many methods of evaluation that are used in the private sector. * * * We felt very squeamish about setting up a formula in the Agency, so we contracted with an outside consultant. * * * He came back and recommended to us that we not try to establish a formula. Disregarding good advice, the Agency more recently proposed a couple of factors that we might take into account in a draft amendment. * * * We got so many adverse comments, frankly, to that that we very candidly admitted our lack of expertise and withdrew that amendment. * * * We frankly don't know how to do it.

*Extending and Amending FIFRA: Hearings Before the Subcommittee on Department Investigations, Oversight, and Research of the House Committee on Agriculture*, 95th Cong., 1st Sess. 173–74 (1977) (Testimony of Director of EPA's Office of Pesticide Programs).

Not surprisingly, Congress concluded that the EPA lacked the requisite expertise in determining compensation, *Union Carbide*, 105 S.Ct. at 3329, and Congress and the EPA agreed that a determination of compensation did not require "active government involvement." *Id.* Consequently, Congress removed all suggestion of a standard from the statute and replaced EPA with binding arbitration as the mechanism for determining what compensation was proper. It seems quite reasonable to this Court that Congress intentionally obliterated all suggestion of a standard in view of the fact that not even the EPA could identify a formula which would adequately compensate a data submitter in every case. Congress determined to leave the matter to arbitrators who had more expertise and could evaluate each case individually.

This Court is not alone in reaching the conclusion that Congress imposed no formulas in delegating this authority to private arbitrators. *See Sathon, Inc. v. American Arbitration Ass'n*, No. 83 C 6019 (N.D.Ill. Mar. 30, 1984) p. 7 ("[t]here is nothing in the statute (or regulations promulgated thereunder) relating to the standard to be applied in such proceedings or providing for judicial intervention in such matters."); *Monsanto Co. v. EPA*, 564 F.Supp. 552, 561 (E.D.Mo.1983), vacated on other grounds, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("there are no discernible guidelines outlining the factors which constitute just compensation."); *Union Carbide Agricultural Products Co. v. Ruckelshaus*, 571 F.Supp. 117, 124 (S.D.N.Y.1983), *rev'd on other grounds*, —— U.S. ——, 105 S.Ct. 3325, 8 L.Ed.2d 409 (1985) ("[p]laintiffs appear correct in their contention that this is a standardless delegation of powers.")

However reasonable it might be for Congress to delegate authority to private arbitrators without specifying factors limiting its use, standardless delegation still is suspect as a potentially unconstitutional delegation of legislative authority under Article I of the Constitution. That issue was identified, but not decided, by the Court in *Union Carbide*. 105 S.Ct. at 3339.

### Constitutionality of Delegation

■ The basis for the constitutional doctrine regarding delegation of legislative authority is as follows:

> The Constitution provides that "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." Article 1, § 1. And the Congress is authorized "To make all Laws which shall be necessary and proper for carrying into Execution" its general powers. Article 1, § 8, par. 18. The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested.

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30, 55 S.Ct. 837, 842–43, 79 L.Ed. 1570 (1935).

Under the decision in *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), the type of provision involved in this suit does not implicate Article I concerns. The *Fahey* court distinguished between statutes which were penal in nature, created novel rules of law where there was no settled law or custom, and delegated to private groups, *id.* 332 U.S. at 249, 67 S.Ct. at 1553, from statutes which were regulatory in nature, creating remedies known to existing law and delegated authority to public bodies. *Id.* 332 U.S. at 250, 67 S.Ct. at 1554.

The first two criteria clearly argue for finding this legislative delegation to be constitutional. The arbitration provision is regulatory, not penal, and serves simply to replace the decision-making body administering a remedy that already existed. As for the third criterion, it is true that the arbitrators here involved are not a public body. However, the concern with delegation to private parties has to do with the private party's interest in the industry being regulated. *See, e.g., Schechter*, 295 U.S. at 539, 55 S.Ct. at 847 (holding unconstitutional a statute delegating power to institute penal provisions to a body comprised of members of the industry involved). The private parties involved here are not memebers of the pesticide industry, but rather disinterested arbitrators appointed by the FMCS, which adopted the roster of the American Arbitration Association. 45 Fed.Reg. 55394–95 (Aug. 19, 1980). Under the *Fahey* analysis, therefore, this is a constitutionally sound delegation of authority.

### Judicial Review

In the absence of a statutory standard, failure to apply any particular standard cannot result in a finding of arbitrator "misconduct" or a violation of due process. Consequently, Stauffer is entitled to dismissal of Counts I and II of the complaint. The Court cannot vacate the arbitrators' award on these grounds.[1]

Stauffer's motion to dismiss Counts I–IV of the complaint is, therefore, granted. Counts I and II must be dismissed because they are dependent on the presence of a statutory standard, and Counts III and IV

---

1. Plaintiff also argues that the arbitrators' award is *ultra vires* insofar as it awards compensation for data originally submitted prior to 1970. The Court notes that the arbitrators "excluded the cost of test data submitted before 1970 and not cited later," and included only "pre-1970 test data that were resubmitted after 1969 and were not substantially duplicative of other data submitted." *Award,* at 18–19. However much this might conflict with plaintiff's interpretation of FIFRA, this Court is not at liberty to second-guess the arbitrators' interpretation. The Court finds that such a misinterpretation, if it is indeed a misinterpretation, does not constitute "fraud, misrepresentation or other misconduct" and thus is not subject to judicial review.

must be dismissed as moot questions of law.